The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, be seated, please. All right, the first case we'll hear this morning is United States v. Curry, and Mr. Cook, I think you're up. May it please the Court. The District Court erroneously held that the exigency doctrine was categorically inapplicable when police heard five or six gunshots arrived on the scene within thirty-five seconds, saw a man who appeared to have been shot, and sought to stop five date men found within twenty-five yards of where the officers heard the gunfire originate. The Supreme Court has expressly identified active shootings as the type of urgent situation where the exigency doctrine can apply, and that was this past summer in the Carpenter case. Let me ask you this, you're not contending this was a Terry stop, you're relying solely on exigent circumstances. That's right. On appeal, we are relying solely on exigency. And so tell me what the exigent circumstances are in this case at the time you seize it. At the time they seize them, they're looking for the person who, or persons, and it was during the five to six shots, and because under the circumstances, just within the last, you know, just eleven days earlier, there had been a homicide. They could not be sure what sorts of, who might be injured on the scene. And when they arrived, this District Court found there was a man with, who was favoring his arm. Now, further investigation revealed that that man was not shot, but the people who even hear this on the video recording as they're driving up Officer O'Brien's body camera, there's a statement, you know, about someone holding their arm and what's he doing. So as they arrived on the scene and were seeking to prevent people from dispersing and control the scene, they couldn't be sure whether or not somebody might have been shot, whether there could be further gunshot, and whether somebody who might be a killer could be escaping. But you would agree that the exigent circumstances would have to exist prior to the seizure? They would, but they certainly had not dissipated when the officers were arriving and seizing the people on the scene. It's fundamental to the exigency doctrine that the police are entitled to figure out what they're facing. And on these facts, there was quite a range of dangers that they could be facing. One of the District Court's points in concluding that the police could not seize anyone was not that there were no dangers here. In fact, the District Court said, despite Officer Gaines's legitimate concern for his own situation, cannot undermine that they need a particularized suspicion. So the District Court wasn't disputing that there was danger, but the court concluded that because there could have been multiple paths that the person might have left, that the police lacked any authority to seize anyone on the scene. And one answer to that, of course, is, again, the man who appeared to be shot, that the police, in light of that and the group nearby, were entitled to infer that they were on the right path. Another point is that because the police didn't have the ability to seal off every avenue of access or egress, that they could not do anything. And there is nothing in the Fourth Amendment to suggest that the police have to have a perfect solution or they can do nothing. And isn't that sort of the point of Illinois v. Edmonds, right, where the court recognizes you can't do this generally, but as long as you think it's likely, not certainly, not positively, not more likely than not, but just somewhat likely that a dangerous person is fleeing in this direction, then you can stop everybody, right? I mean, that's sort of the statement that Edmonds says about if there's a dangerous person, a terrorist attack or a dangerous person fleeing, likely, I think is the phrase used, to be fleeing in a particular direction, you can stop everybody indiscriminately. I think that's right. I mean, I, you know, I would, of course, exigencies require a tailored response. But under the circumstances, it would have to be an actual exigency, right? I'm acknowledging the person fleeing, you know, is close in time. I mean, they sort of assume that there's an actual exigency there. But if they believe that it is likely that they're going to be heading down this road, then they could stop everybody on that road. I think that's right. And the cases about fleeing bank robbers, for example, are a good illustration of that principle, which applies here and certainly easily justifies the seizure of the people out in the field to determine whether they were involved in the shooting and thereby contain the danger to the public, to the officers and even the people out in that area. The dangers in this circumstance are, I think, even further heightened by the fact that it's at night and the difficulty of discerning who might be armed and what they are doing is aggravated in that situation. And it also makes it easier for a culprit to escape. So the police are facing heightened dangers in the circumstances here. And the frequency with which there were shootings occurring in this area only reinforces that. But when the police get to the scene of gunfire within 35 seconds, that's dangerous no matter where it's occurring. And the police have a need to respond to that. The district court's view was essentially that under these circumstances, the only option available to the police was a consensual encounter. So the court said, even in these circumstances with the attendant emergency and safety concerns, the Fourth Amendment allowed the officers only to initiate a consensual encounter. And that's a Joint Appendix 276. A consensual encounter in this circumstance would have been totally ineffective. Everyone was leaving the scene. There were shouts. The police could not determine who might have been the shooter, who might have been injured. And even somebody who was simply a bystander could easily be afraid of retaliation from the shooter and unwilling to volunteer assistance. And so in these circumstances, it's totally rational for somebody to not want to be cooperative with the police, even though the dangers are there. And yet it's also obvious that people want the police to respond to the gunfire. And that's illustrated by the fact that the police are receiving reports, calls about gunfire, even as they're arriving on the scene. So this is obviously a matter of concern. And as the government pointed out below, shortly after the homicide, 11 days earlier, members of this community had, you know, voiced their concern about they have kids. You know, one woman said, I have children. I don't want to be ducking bullets. So the need for police response here is is very high. And if you step back and look at what we say about, talk to me just a minute about sort of officer safety. And it seems to me that that's a big part of the justification that we have here for needing to confirm that the people that they're showing up to don't have weapons. But the flip side of that is that, you know, they've created that situation by entering the arena, if you will. Does that cause us any consternation? I don't think that does. And I would point the court to the Supreme Court's opinion in Kentucky versus King. And in Kentucky versus King, the Supreme Court was addressing whether when the police created a circumstance where somebody might destroy evidence, whether that undermined ability of the police officers to intervene. And the Supreme Court's answer in that case was that as long as the police were lawfully doing what they were doing, the fact that it touched off someone attempting to destroy evidence, for example, was not a reason to constrain the police's ability to respond to the exigency. So here where the police are responding to gunfire, as everyone wants them to themselves, but also, of course, the public, which is equally significant here. And I think it's also helpful to compare this to other scenarios where exigency doctrine might apply and understand that the response has to be tailored to the danger. So, for example, in Birchfield, the Supreme Court said that the police, in responding to an warrant requirement and draw blood, obviously in a gunfire situation, it's pretty hard to imagine a scenario where drawing blood would be justified on an exigency basis. And conversely, in the drunk driving situation, it's hard to imagine that the police would be needing, absent more facts, which those facts could change, but absent more facts that looking for a gun would be an essential part of responding to the exigency of a drunk driver. But here, the police are responding to gunfire in a shooting. And so the effort to identify a gun goes right to the core of the danger that they are trying to stop. And so that's why what the police did here to control the scene and determine who had a targeted on the problem they were facing and would be distinct from other exigencies that might not have as strong a nexus to gunfire and guns that would make the need to determine who was armed as significant. I think another point that is critical about this case was just how quickly the police were able to arrive on the scene and the consistency as the district court found, you know, the vast weight of evidence indicated the shots originated from Walcott Place and all four officers heard the gunshots, all thought they came from the north in the direction of Walcott Place. They had received these calls about gunfire. There had been the shooting 11 days earlier. So the speed with which they arrived, the certainty with which they had that there had been this crime and the relatively contained area that they were looking, all supported that this was a well-targeted response to the danger that the public and the police officers faced. If the officers did nothing because they said the court instructed them they could do nothing and they watched these people walk away, would there be a legitimate claim of poor police work by the people in the community who are trying to suppress the gunfire and the police come in and say we're not allowed to act in these circumstances because we didn't have enough suspicion about any given individual and therefore we had to let them go? Legitimate criticism of that, wouldn't it? I agree completely. And I think that the ability of police to stop people on the scene can be absolutely essential for solving the criminal conduct here. That if you come back and investigate later, people are going to be very afraid of retaliation. And so they're going to be reluctant to come forward. Eyewitness identification evidence can be readily challenged. And so even if you're able to find somebody who's going to report what they saw, that evidence will be susceptible to attack. So the ability to have the police respond on the scene is really essential. And I just want to make sure we're distinguishing between two things, because the rationale you're giving there is sort of a prosecution rationale, right? Like they need to do this because it will help us prosecute them. And we're not necessarily thinking about that as the exigency, right? The exigency we're really focused on here, as I understood your argument before, was the danger to the officers, the community, the individuals. It's stopping people from getting killed, not necessarily focused on putting people in jail. And are we really focused on the danger in the exigency piece, not the eyewitness testimony, ability to get evidence aspect of the decision to do what they did that night? That's exactly right. Although the two are overlapping and the Supreme Court in Brigham City pointed out that they can be overlapping. And the fact that you have those twin concerns doesn't in any way undermine what the police are doing. But in order to address not just the immediate danger, but to ensure that, you know, in another three minutes there isn't another person who was shot because there's some running feud in this neighborhood. And as soon as the police have lost control of the situation, somebody else is going to resume gunfire. You need to be able to accurately determine who was the culprit and take that person into custody. And so if you do not respond at the time in a way that allows you to get your best evidence, then you're going to fail to address the exigency and the danger there. But Your Honor is right that the... You're saying the evidence, securing evidence that otherwise would be lost is also a legitimate aspect of the exigency, excuse me, component? Yeah, it furthers the mission of containing loss of life, that if you can't accurately determine who is the culprit, you're not going to control the danger that you're facing on the scene, both in the short run and in the long run. And I think, you know, even the short run concern is really pressing and sufficient to the police intervention here. And if you go back to the broader principles the Supreme Court has announced for seizures less intrusive than arrests, going back to Brown versus Texas, the three factors the Supreme Court has listed there, the gravity of public concerns, the degree to which the seizure advances those concerns, and the severity of the interference all firmly support what the police did. The gravity of the public concerns could not be greater in responding to police, to gunfire in a public place. The seizure could be instrumental in stopping that danger. And the severity of the interference is pretty limited because it's a brief seizure and a determination of who on the scene is armed. Let's see if my time is up. Thank you, Mr. Cook. Ms. Platt. Good morning, Your Honors, and may it please the Court. I'd like to start with three preliminary points. First, the standard of review. Under this Court's decision, the United States versus Reed from 1991, citing Turner from 1981, when the dispute on appeal centers on whether the district court properly found that the government had failed to show the presence of exigent circumstances justifying a warrantless seizure, the district court's finding must be sustained unless it is clearly erroneous. So the standard and review on the exigent circumstances issue, which, as Judge Floyd noted, is the only one the government is pursuing, is a clearly erroneous standard. You know, that's I don't know if it's useful to go too deeply into this, but these issues always have a blend of law and facts. It seems to me the underlying facts, which the government doesn't seem to be challenging what occurred that night, are challenged on a clearly erroneous standard. Whether those facts amount, as a matter of law, to a circumstance where the police can act would be a question of law. It's a little bit like negligence. I mean, there's a standard of negligence and there are facts constituting negligence. When I'm the appellate, Your Honor, that's how I go through it. I think we all understand the standard of review that the fact finding that was done by the district court is subject to clear error. So, and the facts that the district court found, Your Honor, include that Mr. Curry was not a suspect because there was no suspicion that he was involved in any crime, including a shooting. He was not fleeing. He made no furtive gestures. And because there's video, you can see all of this. And the field, while it was... Why do you know he wasn't fleeing? Well, it's a finding of fact that the district court made, Your Honor, that he was not fleeing. And in fact, there's video. He wasn't running, but he's walking away from the source of the gunfire. The district court found that he was not fleeing. That's a quote from the district court opinion. I understand, but I looked at the tape several times and I saw him walking away from the scene. And they got out of the car quickly and said, hold, put your hands up. And he put his hands up. I mean, as wise citizens do, he complied with the order of the police. He's not running, but he's walking away from the source of the gunfire. And then he turns around and tries to explain where it came from. But, Your Honor, walking is not fleeing. I mean, fleeing implies flight. So walking calmly in a public place, which is effectively the backyard of the apartment building, is not flight. And that is a finding of fact of the district court. All right. How about if... And the government has not challenged that. It's clearly erroneous. How about if an officer in a neighborhood walks up to a small group of people who the officer believes may be involved in some untoward conduct, and as a police officer comes to the group, one of the persons turns slowly and starts walking away. Is he fleeing? I think that depends on the facts of that case, Your Honor. I just gave you the facts. I think a person who walks slowly away is, by definition, not fleeing. And so, meanwhile, as the Supreme Court says in Welsh v. Wisconsin, quote, no exigency is created simply because there is probable cause to believe that a serious crime has been committed. Put more simply, crime itself is not an exigency. While I understand that crime is a serious problem, crime cannot be an exception to the criminal law. Help me understand. I want to make sure that I distinguish between two arguments. I'm not perfectly clear which one you're making. One argument, and maybe both, but one argument is exigency can never permit sort of the seizure of an individual without individualized reasonable suspicion. I'm not making that argument, Your Honor. I think there could be an exigency that would do that. This is not that exigency. Yes. So your argument is not that we got a terrorist event, that we can't do anything with it. Your argument is different. You agree that an exigency could justify a baseless stop. Yours is really this statement here that, yes, that could be, but it's not here. Correct, Your Honor. So, for example. Help me understand, because the district court takes the argument that you seem to disavow. The district court seems to say that, no, no, no, just doesn't work. So, Your Honor, actually, that was going to be my third point, and I'm glad you raised that, Judge Richardson, because the government, both in its brief and this morning, I think one of the first things that my colleague, Mr. Cook, said is that the district court categorically says this can never be a thing, to paraphrase. And that's not, in fact, what the district court said. What the district court said, and I quote, is that I'm on page 277 of the joint appendix, which is in the memorandum opinion of the district court. And in the middle paragraph on the page, the district court says, although this might be true in other circumstances, the court cannot find that the Fourth Amendment gives officers such broad latitude in this situation. So, the finding to be sustained in this case is just that this exigency, if there was one, doesn't sustain what the officers did here. In a case like, for example, the Boston Marathon or some other more broad, God forbid, terrorist bomb, major exigency situation, officers would obviously have broader exigency and violence, but an isolated shooting is not the same as a bomb in a marathon. And so, really, you're conceding that it could in some case. Correct. But in this particular case, your argument is that the facts that he went through earlier and that we all sort of know, that those don't create an exigency. They don't create an exigency where justifying what the police did in this circumstance, which is seizing pedestrians without any suspicion, particular as to that human. All right. So let me break that, because that seems to be two different arguments again, right? So one, are you saying it's not an exigency at all? Right, so that it wouldn't have justified any kind of anything by officers or that the fit, the tailoring, if you will, of asking them to lift up their shirts, that that was too intrusive, given the degree of exigency? I think I'd argue both, Your Honor. So I would like to say it's like, so I think they could have and this is the other thing I would say. We're not saying the police can't do anything. We're saying in response to gunfire, which again is dangerous and bad, we're saying that they can't seize people without suspicion that those people are involved in crime. That is effectively the Terry doctrine. And below, the government argued Terry first. They didn't raise exigency until the supplemental briefing when perhaps they could see the writing on the wall. So this should be a Terry case. And then they broadened their arguments. And so the facts here where you're seizing pedestrians. And so with Edmond, the governmental need in regulating motorists was involved in that. And in fact, here, there's no single escape route. It's a field in a neighborhood where the criminals could have gone anywhere. But that's the point of Edmond, right? Edmond says it's not even like they're just saying there's a dangerous criminal. Right. So that's not even that seems like less exigency than we have here. Right. You just have a dangerous criminal and they're fleeing. And it is likely, whatever that means, that they may be going down this road. In that scenario, Edmond says, and maybe you want to say it's dicta, but I wouldn't take that tact if I was you. But Edmond tells us you can stop everybody on that road. Right. Even just because you think it's likely not that like there's, you know, a crime occurring or may occur again or there may be retaliation, which we have here. But just that there's a dangerous criminal. He may be on this road and therefore you can stop everybody without any individualized suspicion. So as my colleague said, when you asked him that question, I think this is like these bank robber cases from the other circuits or like Harper from from this court in 19, I think, 1980. That's one likely route where, you know, that the criminal or the GPS in the money from the bank robbers, where, you know, where the where the person with perpetrators going, that is a form of reasonable suspicion as to the car, as the money, as not to everybody on that road. It's not individual. I mean, that's sort of your that was sort of your argument below is it's not individualized with respect to everybody on the road. You may know it's on the road, but there are a thousand people on the road. But there's there's no case that is that is allowed the stop of a thousand people. You are in most of those cases. They stop five cars or 10 cars and they knew that the person was in a very small area because of GPS tracking. There's no case that is allowed for suspicionless stops of a large number of people. That's what Edmond tells us, that you could do that. That's what Edmond says. I mean, you think that's either do you think it's wrong or do you think that Edmond didn't say it? I think that if Edmond said that, it's dicta. Edmond disapproved the roadblock in Edmond. And the other thing is it it relied specifically on the fact that they were motorists and not pedestrians, which gets to the governmental interest in regulating highways that doesn't exist in this case where a person is walking in a public place. So, again, there is no case that the government has cited or that I have found where a suspicionless pedestrian has been allowed to be stopped under the rubric of the incident circumstances doctrine. And so, again, this case involves no suspicion as to any of the men in the field and particularly my client, Mr. Curry. Well, it depends about the level of suspicion, but what you're they come within 35 seconds to the scene and walking away from the scene are five to eight men in a confined geographical area. Well, it's not a confined geographical area, Your Honor. It's a whole neighborhood of a city. Well, no, not where the gunfire was. They're coming away from the apartment or Walcott. They're coming across between the apartments. They're coming across the field. The headlights are coming on them. And there's five to eight. And this is a confined area. This is not a street of hundreds of people watching that scene. And you're going to frisk everybody. These are people who could, with good police work and intuition, be persons of interest. And that's Terry, Your Honor, without reasonable suspicion. You can't stop everybody. We're talking about reasonableness under the Constitution. Terry is an aspect of reasonableness in the factual circumstance. But if you look at all the Supreme Court cases, the touchstone is always reasonableness of police work. And police and the government has the burden to justify a warrantless seizure or search. And they have to fall within a well-delineated exception as well as be reasonable. So reasonableness is a touchstone, but it also has to fall within a all the way back, you know, going decades. And as recently as Carpenter and Gantt and cases from within the last 10 years says, it has to fall within an exception. These officers come in late at night to an area where they've had two homicides. Well, it's not late at night, Your Honor. It's 9 p.m. Yeah, it's nighttime. They can't see. There have been two homicides in that area. There have been six shootings. It's a rough area. They had complaints from the neighbors. They had five or six shots. They don't know whether somebody was killed, somebody was injured. They see somebody they think might be injured. So as to be injured. And then they see the only people they see in that field, which is near where the gunfire are, five to eight people. So that's that's also incorrect, Your Honor. There were other people standing by the buildings. That's a finding of fact. And there are hundreds of families in the area. Officer Gaines testified it's not unusual to see people in this backyard area. It's a field between two apartment complexes. And so I watched the tape, too. I didn't see anybody else that went across the field except these five to eight. Again, the court found that there were other people standing around up around the building that they're there, you know, existing in their neighborhood in the evening and in the late summer, you know, the early fall time. It's not unusual, as Officer Gaines testified. Let me ask you a question that I asked Mr. Cook. If the police, let's just add a couple of little facts that the police didn't know or which is a few yards away. And these people are walking away from the scene and the police said we can't do anything because the district court has said we can't do anything. And they watch them go by. They say, please, you guys stop over here and talk. I say, have a good evening. They keep walking. Community called in several times about the gunfire and the police did nothing. Would you call that good police work? So I have a couple of answers. So they're absolutely welcome to ask any citizen to consensually interact with them that they would like. That's not the choice that they made, as you can see on the video. And with regard to the emergency aid exception, like the person who may have been injured, which, as Mr. Cook acknowledged, was not injured, they're absolutely welcome to enter a building to see if anyone is injured or not and to aid that person, which is not an issue here. My facts are officers come onto a scene within 35 seconds where there's been shootings. Yes. They don't know whether somebody's been killed, somebody's been hurt, or whether the gunfire went into the air. They know this is an area of homicides. They know there have been shootings here. They have complaints from the neighbors. And they're now seeing four people walk away from the scene and you're saying they can't do anything because there's nothing not particularized. I'm not saying they can't do anything, Your Honor. And under the emergency aid exception, if they have reason to believe that, you know, they don't have reason to believe, they have no knowledge. Right. And so they're going to let them go. The contours of the exception are if there's reason to believe that there's a victim in a particular apartment, they can go in that apartment to help that person. That's a well-recognized exception. My hypothetical is this one. And the hypothetical is basically, would it be considered poor police work if they just let these people go right on through without investigation? I'm not an expert in what is poor or good police work, Your Honor. I'm here to talk about whether... Well, that's responding to public complaints. Isn't that part of the calculus? I mean... On reasonableness? No, the calculus is whether the seizure of a person without reasonable suspicion is, in these circumstances, justified by any recognized exception to the Fourth Amendment and any existing case law. Again, the government has not cited a single case where a pedestrian checkpoint type situation has been allowed by a court. Let me ask a different question. So imagine the scenario where the officers see gunshots come out of a bus. Right. And you'd agree if that happens, they could stop the bus, even under your theory, right? Sure. Okay. I mean, that's probable cause. Okay. Um, and then they, so they stopped the bus and on the bus are 50 people, right? It's a Greyhound bus, right? So they're not like choosing to travel together. Like Greyhound has put them there, uh, by themselves. And they pull the bus over and the officers say, listen, get off the bus, but do it with your hands up because, you know, there's, might be a gun. We're concerned. We don't want there to be further gunfire, et cetera. And they pat everybody down coming off the bus. Permissible? So I think that's a lot like the Palacios case from the second circuit, um, where you know that the perpetrator of a crime is in a particular location. All right. So then, then the next question, exactly right. The next question, they're following the bus, the bus pulls over. When the bus pulls over, a handful of people get out and run, right? They secure the bus at that point. And they do the same thing. They say, listen, may well be that the guy with the gun, indeed, it might even be probable the guy with the gun ran. Cause he fled. Cause he fled. But listen, we know there was gunfire. We're officers. Like we have families at home, right? We have stopped this bus. We're going to pat everybody down on the bus because we have, you know, reason to believe, not that you getting off the bus here have a gun, but somebody on that bus had a gun and you were on that bus and there are 50 of you, but I'm going to pat down everybody for the same reason that we say in Edmonds, listen, it's somewhat likely that, you know, there might be a gun here. So I think, you know, I think your honor, your, your new hypothetical has just changed the math of the likelihood that the perpetrator's on the bus. It's 50 people on the bus and two of them have run leaving aside that the perpetrator probably is the one who ran. And I'm assuming one of your police officers chase the person who ran, which under court law is legal under Terry. Um, because that's reasonable suspicion. I know, but I'm talking about people on the bus. Yeah, no. And so I'm not sure you really, no, you can't do that. Then in that scenario, I think it's either the officers have to say, hope my bulletproof vest works and continue their investigation. I'm not sure. That's different than last question. So they have two options and your world, either they got to just let the bus go or they've got to say, I just hope that my vest works. So when somebody shoots me that I, I go home. I think that this, I think your second hypothetical is still permissible because it's still a confined world of people who committed the crime. Unlike an entire neighborhood where there's no likely escape route. There's no, there's no description of the shooter. There's no reason to believe that anyone in that particular location had anything to do with the shooting that had just happened. But you have an entire neighborhood of Richmond. In this case, the facts is found by the district court. It's a whole city that could be the person. You're making an exception to the argument you just made. You can't argue to me a little bit earlier. You have to have some particularization about the suspicion that these four, eight guys walking across. And now you're allowing in your argument to judge Richardson that you don't have to be particularized. It just has to be confined. Well, the confining is the particularization, Your Honor. In, within those 50 people, the shooter is there. Not as to three persons who are just traveling from North Carolina to New York on the bus. I mean, these people say, I can't stop. This, this hypothetical has precedent that has allowed it from the second circuit as Palacios and Harper. In fact, from this court. No, I'm talking about the argument. I'm not talking about the case. And the argument is it doesn't have to be particularized to somebody who you suspect. It can be confined. You have, it has to be reasonable in trying to reach the conclusion of finding the source of danger and protecting everybody against the danger. But, but either way, Your Honor, as I said, the, the instance of, of even serious crime under Welsh versus Wisconsin and the outcome of Edmond and, um, and in, in Mincy versus Arizona, there is no murder scene exception under the exigent circumstances doctrine. In that case, it was actually a police officer who got murdered. And so the Supreme Court in so many cases in Edmond, in Mincy, in Ibarra, in all of these cases, the government has repeatedly asked for what is effectively a crime or a crime scene exigency and the exigent circumstances doctrine. And the Supreme Court for decades has repeatedly refused to hold that crime, even murder under Mincy is an exigent circumstance that it's used as the police. Hypothetical for a minute. So you're conceding the bus, couple people get off and run. We can pat down everybody on the bus. Um, because in your words, it's confined and this is the bar example that you get from the second circuit. Um, what, why does the confinement require like metal or mortar? Right? So why don't we talk about areas being confined based on time and geography? Right? So the idea here is, listen, if you show up 30 minutes late, you don't get a broad based murder scene exception. We get that, right? But here you show up 35 seconds late and you say it's the whole city, which is not really accurate, right? If you show up 35 seconds after a shooting, there's only a confined area that someone could have traveled in between the time of the shots and the time that you arrive. And yes, maybe this is only one piece of that concentric circle. There's one pie slice and these are the people that are in it. And so why aren't, why isn't that example just like a different containment than, you know, you can see bricks and mortar or metal and tires are containment. Why don't we think about that in time and space as well? So you're right. I think that's goes to exactly what the precedent said is, is the, is the only escape route, which again, with the bank robber cases and the GPS money, they also say, you know, um, or Harvard, this case, this court's decision from, I think 1980 is where, you know, the route, the person's traveling, which in this case is a 360 pie. I understand, but you've already conceded, you've already conceded in the bus example where people have already gotten away. Right. So we know it's not the only route because we know people are gone. So you've conceded in that case where we've got people that are going two different directions, some on the bus, some off the bus, you say, oh, it's okay because there's confined by, you know, tires and metal. But I'm just saying here, it seems like to me that we've got them confined in time and space in just the same way. But your Honor, so it's both the route and the fact that they didn't have a description. So even stopping the people in the field, if the idea is to identify someone like in Palacios, they actually were trying to identify a known suspect by, by sight. And here they don't even know, they don't have a description of the shooter. They're trying to identify a guy with a gun. Like that's the identifier that they're looking for. The gun that was found on my... I don't mean to be picked for a girl, but like they're trying to find somebody with a gun. That is an identifier. The gun that was found on Mr. on Mr. Curry was, was not the gun that was used in the shooting in this case. And so, I mean, this is a general crime control, which under Edmond and Mincy and Welsh versus Wisconsin and Ibarra is, is not an exigent circumstance that is a recognized exception. I would ask you to affirm the district court. Thank you. I see your red light is off. Thank you, your honor. Yeah. Mr. Cook, you have a little time. I'd like to briefly touch on what the district court ruled in the standard of review. The district court made a legal error. The court concluded that exigency could not overcome the, the danger here was insufficient regardless, because there was a lack of particularity in isolating this defendant among all others as the possible culprit. So help me understand this line that we talked about briefly with your colleague. You sort of take the position that that is a legal decision. She says, she cites the sort of generic language, you know, in this case kind of scenario. But what about the district court's opinion? Should I read to conclude that that was sort of more categorical than, than your colleague suggests? I would look at joint appendix page 281, where the court said, despite officer Gaines's legitimate concern for his own safety and the safety of his partners, the exigency in this situation cannot undermine the four circuits clear holding that the basis for suspecting the particular person stopped of criminal activity. So throughout the courts, district courts statements during the hearing and in the overarching point in the district court's ruling was that because the evidence hadn't isolated the defendant to the exclusion of others as the possible shooter, there was no way for exigency to authorize the police to do anything. And so that is the core error that the district court made. The fact finding that the court made of historical fact easily supports an exigency here. And so just relying on the broad principles that go back to the Supreme Court's opinion or Neil's about how Fourth Amendment analysis is done on appeal, the ultimate legal conclusions here are legal ones. And the historical fact finding that the district court made easily shows that there was a very dangerous circumstance here that the police needed to respond to, and that was a danger to the police and the public, as well as the people on the scene that the police were trying to sort out who might have been the shooter. And the district court repeated this kind of legal error earlier in its opinion. It said, even in these circumstances with the attendant emergency and safety concerns, the Fourth Amendment allowed the officers only to initiate a consensual encounter. And that's on Joint Appendix page 276. I'd ask the court to reverse the district court and remain. Thank you, Mr. Cook. We'll come down and greet counsel and then proceed on to the next case.
judges: Paul V. Niemeyer, Henry F. Floyd, Julius N. Richardson